**PACIFIC TRIAL ATTORNEYS**
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
4100 Newport Place Drive, Suite 800
Newport Beach, California 92660
Telephone: (949) 706-6464
Facsimile: (949) 706-6469

Attorneys for Plaintiff

**UNITED STATE DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

TANYA CANTU, individually and on behalf of all others similarly situated,

Plaintiff,

v.

NINTENDO OF AMERICA, INC., a Washington corporation, d/b/a WWW.NINTENDO.COM,

Defendant.

Case No. 2:26-cv-01520-SPG-AGR

**SECOND AMENDED CLASS ACTION COMPLAINT**

**1. Violation of Cal. Penal Code § 631(a)**
**2. Intrusion Upon Seclusion**
**3. Violation of Cal. Const., Art. I, § 1 (Privacy)**

Plaintiff Tanya Cantu ("Plaintiff"), individually and on behalf of all others similarly situated, alleges against Defendant Nintendo of America, Inc. ("Nintendo" or "Defendant") as follows:

## I. NATURE OF THE ACTION

1. This action concerns Nintendo's covert interception and disclosure of the contents of visitors' private communications with www.nintendo.com, including Plaintiff's confidential on-site search, together with device, browser, session, cookie, and persistent-identifier data that allowed multiple third-party advertising and data-broker systems to recognize, profile, and retarget her. The interception occurred automatically, in real time, and before Plaintiff had any meaningful opportunity to learn of, much less consent to, the third-party surveillance.

2. On Friday, August 9, 2024, at approximately 3:18 p.m., Plaintiff visited www.nintendo.com (the "Website") for the genuine purpose of locating video games and information. She used Nintendo's own search function and typed the confidential search query "autistic friendly video games." Plaintiff intended that query for Nintendo alone, to obtain responsive Nintendo products and information. She did not intend to communicate that phrase, or the fact that she had searched for it, to Meta/Facebook, TikTok, Xandr, The Trade Desk, Adobe, Google/DoubleClick, or any other advertising, analytics, audience-matching, or data-broker service.

3. Nintendo did not display a cookie or privacy consent banner before Plaintiff made that search, did not identify the third parties that would receive information about her interaction, did not ask whether those third parties could receive the contents of her search, and did not obtain any affirmative consent. Plaintiff did not click "accept," did not assent to a privacy policy, and did not otherwise authorize third-party interception of the search or its associated identifiers.

4. After the search, Plaintiff began receiving social-media advertising for "autistic friendly video games" and closely related content. The temporal sequence and topical identity were not generic: Plaintiff entered that precise sensitive phrase into

Nintendo's search interface and thereafter encountered advertising keyed to the same subject. Those post-search ads are circumstantial evidence that information derived from Plaintiff's confidential Nintendo search was disclosed into the advertising ecosystem and used to associate that sensitive interest with Plaintiff or an identifier linked to her browser or device.

5. Subsequent forensic testing of Nintendo's Website confirmed the technical architecture capable of accomplishing exactly that type of disclosure. The Website loaded third-party tracking scripts and pixels before any consent opportunity, sent network requests to third parties, synchronized external identifiers, transmitted IP-address and user-agent/device information, and stored tracking cookies that support recognition across sessions and websites. The testing identified, among others, Meta/Facebook, TikTok, Xandr, The Trade Desk, Adobe Audience Manager, and Google Ads/DoubleClick.

6. The Second Amended Complaint does not rest on the proposition that an IP address, standing alone, is private "content." Plaintiff's concrete injury arises from interception and disclosure of the substance of her own confidential search communication – "autistic friendly video games" - and from the linkage of that content to persistent identifiers, browser/device characteristics, page/session data, and advertising identifiers that made the disclosure useful for profiling and retargeting. Those accompanying identifiers magnified the invasion by enabling third parties to connect the sensitive communication to a persistent browser or advertising profile.

7. The privacy invasion is concrete and particularized. Plaintiff personally authored the search. It concerned autism, a sensitive neurodevelopmental subject. She communicated it through Nintendo's search field for the limited purpose of obtaining Nintendo search results. The alleged third-party interception stripped Plaintiff of control over who learned the content of that inquiry and permitted unrelated commercial surveillance companies to append the inquiry to advertising profiles and persistent

identifiers. A reasonable person would find covert commercial interception of such a search, before notice or consent, highly offensive.

## II. PARTIES

8. Plaintiff Tanya Cantu is a natural person and resident of California. During the relevant visit, Plaintiff was a genuine consumer of Nintendo products and information. Plaintiff also has experience testing websites for privacy practices, but she did not know before making the August 9, 2024 search which third-party surveillance code Nintendo had embedded, which recipients would receive the search and associated identifiers, or that the substance of her search would be disclosed for advertising or profiling. Plaintiff's tester status did not authorize Nintendo or third parties to intercept the contents of her communications.

9. Defendant Nintendo of America, Inc. is a Washington corporation that develops, markets, distributes, and sells video games, gaming systems, digital content, and related products and services, and operates www.nintendo.com for consumers throughout the United States, including California.

10. Nintendo intentionally designed, controlled, and operated the Website and selected, enabled, configured, or permitted the tracking code and third-party integrations described below. The third parties could not have intercepted Plaintiff's communications in the alleged manner absent code or network integrations embedded in, called by, or permitted through Nintendo's Website.

## III. JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(d) because this is a putative class action in which the proposed class exceeds 100 members, at least one class member is a citizen of a state different from Defendant, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Defendant removed this action to this Court on February 12, 2026.

12. This Court has personal jurisdiction over Defendant because Defendant purposefully directs the Website and its commercial activities to California consumers,

sells products and digital content into California, and caused the interceptions and disclosures alleged herein to occur when Plaintiff and Class members used the Website in California.

13. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this District and Plaintiff used the Website in this District.

## IV. FACTUAL ALLEGATIONS

### A. Plaintiff's August 9, 2024 Search and Particularized Communication

14. On August 9, 2024 at approximately 3:18 p.m., Plaintiff navigated to www.nintendo.com using her personal browser and device. She was genuinely interested in Nintendo's products, services, and information and used the Website as an ordinary consumer would.

15. The Website provided a search interface that invited users to type free-form words and phrases to locate games and related information. Plaintiff placed her cursor in that search field and entered the exact phrase: "autistic friendly video games." She then submitted the search to Nintendo so that Nintendo would return responsive results.

16. The search phrase was the contents of a communication authored by Plaintiff. Unlike an IP address or bare domain name, it conveyed substantive semantic information chosen by Plaintiff. It revealed the subject of Plaintiff's inquiry and a sensitive interest concerning autism-friendly entertainment. The query was not necessary for internet routing; it was the message Plaintiff intended to send to Nintendo.

17. Plaintiff expected that Nintendo would receive and process the search in order to return results. She did not expect that advertising networks, audience brokers, social-media platforms, or unrelated analytics companies would contemporaneously acquire the query or information derived from it and associate that content with persistent identifiers.

18. No pop-up cookie banner or comparable notice appeared before Plaintiff made the search. Nintendo did not ask Plaintiff for permission to disclose search contents

to third parties. Plaintiff did not see or click any "accept" button, did not opt in to targeted advertising, and did not affirmatively assent to a privacy policy before the interception and disclosure alleged herein.

19. Plaintiff did not know which third parties had been embedded into the Website, which network requests would be initiated by her search, which identifiers would accompany those requests, or that her sensitive search activity could be joined to profiles maintained outside Nintendo. Her later investigation was undertaken because she observed advertising behavior that gave her reason to suspect such disclosure.

20. Beginning after the Nintendo search, Plaintiff observed pop-up and social-media advertisements for "autistic friendly video games" and closely related subject matter. Plaintiff had not authorized Nintendo to use her confidential search as an advertising signal for third parties. The repetition of the same subject in subsequent advertising is consistent with the operation of the audience-matching and retargeting technologies later observed on Nintendo's Website.

21. On information and belief, Plaintiff's search event caused or was contemporaneously accompanied by one or more third-party network transmissions that disclosed the search term itself, a search-results URL or request containing or reflecting the term, a page/event label derived from the term, or another event parameter conveying the substance of Plaintiff's inquiry. Those transmissions were accompanied by identifiers and device/network data that permitted recipients to associate the search event with Plaintiff's browser, device, advertising profile, or previously synchronized identifiers.

22. Plaintiff pleads the preceding allegation on information and belief because the precise server-side fields and third-party event payloads are uniquely within Defendant's and the recipient vendors' possession. Plaintiff has nevertheless alleged concrete facts supporting the inference: the exact search, the absence of consent, the immediate sequence of later ads keyed to the same subject, and forensic confirmation that Nintendo's Website deployed third-party advertising and identity-synchronization technologies capable of receiving page-level and user-level events before consent.

**B. How the Website's Spyware Operates**

23. A modern web page is not a single bilateral communication between the user and the website named in the address bar. When a visitor loads a page, HTML and JavaScript can instruct the browser to initiate additional network requests to third-party domains. Those requests may execute automatically, without any additional click by the user, and may occur while the user is still communicating with the first-party website.

24. A tracking pixel or tag is code that causes the visitor's browser to contact a remote third party and transmit information about the page view or event. A "pixel" need not be a visible image. JavaScript, fetch/XHR requests, image beacons, iframe calls, and tag-manager injections can all perform the same surveillance function: making the user's browser send data to a third party in real time.

25. Third-party tracking becomes substantially more invasive when content about the user's activity is coupled with identifiers. The forensic investigation observed techniques including acquisition of IP addresses, synchronization of external identifiers, transmission of TCP/IP-derived address information, collection of user-agent and device particulars, and cookie sharing in requests. These data elements allow an advertising recipient to recognize that multiple events came from the same browser or profile and to join the event with information previously collected elsewhere.

26. A user-agent string and related browser signals can identify the type of browser, browser version, operating system, device class, language or similar technical characteristics. In combination with IP-derived location, first-party identifiers, third-party cookies, advertising IDs, and synchronized IDs, these signals materially increase the ability to recognize and profile a visitor.

27. Cookies such as third-party advertising cookies and first-party identifiers are not merely passive files. They function as keys. When the browser later sends the key back to the tracker, the tracker can retrieve or update the profile associated with that identifier and connect activity across sessions and, depending on the vendor, across unrelated websites and apps.

28. Identifier synchronization further expands this surveillance. One platform can cause the browser to contact another platform with an identifier mapping so that two different IDs are recognized as referring to the same browser or advertising profile. Once synchronized, a sensitive page or search event observed on Nintendo can become commercially useful outside Nintendo.

29. The timing is critical. The forensic report observed third-party resources loaded and visitor data shared immediately upon page load, before any opportunity to consent to or decline a cookie/privacy policy. Thus, the interception is not a later disclosure of a completed communication from Nintendo's records; it is contemporaneous acquisition by third parties while the browser is sending and receiving web communications.

30. The Website's architecture therefore operated as spyware in the ordinary technological sense: code placed in the user's browsing environment that silently observed activity, caused information to be transmitted to external entities, persisted identifiers, and enabled cross-site profiling for commercial purposes without a contemporaneous, informed opt-in.

**C. Forensic Evidence of Pre-Consent Third-Party Surveillance**

31. Plaintiff retained a computer expert to investigate Nintendo's Website. The expert conducted testing after Plaintiff's visit and observed the Website loading and communicating with multiple third-party tracking services before the user had provided consent. The expert documented the loaded resources, network requests, cookies, and vendor-specific tracking behavior.

32. The later forensic observations are not pleaded as a substitute for Plaintiff's August 9, 2024 experience. They corroborate the mechanism and continuing architecture alleged by Plaintiff. On information and belief, materially similar tracking integrations were deployed during the relevant period, including during Plaintiff's visit, and Defendant's records and tag-management histories will identify the precise vendor configuration and event payloads in effect on August 9, 2024.

33. The expert found Meta/Facebook tracking code that monitored visitor activity and sent requests to Meta for commercial tracking. The observed payloads included external user IDs used to synchronize visitor data across advertising platforms. Such identifier linkage is designed to transform a page or event observed on Nintendo into an event connected to a broader advertising identity.

34. The expert found TikTok tracking. TikTok requests can identify the specific page view and session, device type, browser and version, timing, and user or advertising identity. The investigation observed TikTok's _ttp cookie, which supports campaign measurement, ad personalization, and continuity of tracking across sessions.

35. The expert found Xandr (Microsoft-owned) communications to adnxs.com. Xandr operates a programmatic advertising and data marketplace. The observed requests exposed device/location-related information, and tracking cookies supported persistent recognition of the browser. In an advertising ecosystem, such identifiers enable a sensitive event to be matched to an audience profile and transacted for targeting.

36. The expert found The Trade Desk, a programmatic advertising platform. Web beacons were sent to The Trade Desk servers and tracking cookies were stored on the browser, enabling activity observed on Nintendo to be associated with a persistent profile and used across other websites.

37. The expert found Adobe Audience Manager (demdex.net), an audience-management and data-matching platform designed to collect website activity, build behavioral profiles, segment users, and support targeted advertising and content personalization. The observed demdex, dpm, and dextp cookies facilitate identification, matching, and synchronization of visitor activity.

38. The expert found Google Ads/DoubleClick tracking. DoubleClick beacons and cookies are used to monitor page activity, support advertising measurement, and enable cross-session recognition. The expert documented the IDE cookie and described how page-view requests can expose the specific page view, web session, device/browser information, and timing to Google's advertising infrastructure.

39. The combined effect of these integrations is not equivalent to Nintendo merely "seeing" a visitor. Multiple independent commercial surveillance entities are placed in the communication path and receive event-level data plus identifiers. The value of the data depends on joining what the user did - including what the user searched for - with who or which persistent browser profile did it.

## D. The Search Was Content, Not Merely Addressing Information

40. Plaintiff's claim under section 631 is based on interception of communication content, not merely an IP address, bare URL, or generic HTTP routing field. The phrase "autistic friendly video games" is semantic content authored by Plaintiff. It communicates the subject of an inquiry in the same way that words typed into a message, chat box, or form field communicate substance.

41. The fact that web applications may encode a search term into a request parameter, URL, event name, or JavaScript payload does not strip the term of its content character. The distinction is functional: information used only to route the communication is addressing information; the user's chosen search words convey meaning and are the substance of the communication.

42. The intercepted communication was accompanied by identifying and contextual information, including IP-derived address data, destination domains, request endpoints, device/browser signals, session identifiers, cookies, and synchronized advertising identifiers. Although Plaintiff does not contend that those technical fields are themselves the confidential content of her search, they made the interception more invasive by allowing third parties to associate the substance of the search with a persistent user, browser, device, or advertising profile.

43. By pleading the exact search, the action Plaintiff took, the lack of pre-collection notice, the third-party advertising stack, and the post-search retargeting behavior, Plaintiff identifies the particular communication and the particular privacy interest the Court found missing from the prior pleading.

## E. No Consent and No Privacy-Policy Assent

44. Plaintiff did not consent to third-party interception. She was not presented with a consent banner before making her search, did not click an acceptance control, and did not otherwise manifest affirmative assent to disclosure of search contents to advertising and data-broker recipients.

45. A privacy policy that a visitor could theoretically locate after landing on the Website is not the same as contemporaneous consent to interception. The alleged spyware began operating before Plaintiff had a meaningful opportunity to review such a policy. A post hoc policy cannot retroactively authorize an interception that already occurred.

46. Nor did the absence of a banner place Plaintiff on notice that she should expect secret interception. To the contrary, the absence of a collection notice and of any request for permission reinforced Plaintiff's reasonable understanding that her free-form search was being submitted to Nintendo for search results, not broadcast to third-party advertising systems.

47. Plaintiff did not consent merely by being a privacy tester. She did not know the specific vendor configuration or that her precise search content would be disclosed. The Court has already recognized in this case that tester status does not itself extinguish a reasonable expectation of privacy where the plaintiff is genuinely interested in the Website and unaware of the surveillance at issue.

**F. Concrete, Particularized, and Highly Offensive Injury**

48. Plaintiff personally suffered the alleged privacy invasion. She, not a hypothetical user, typed the sensitive search. Her browser, device, session, and identifiers were the subject of the tracking. Her search was the content allegedly disclosed. And she personally experienced subsequent advertising keyed to the same subject.

49. The injury is concrete because it closely resembles harms traditionally actionable for intrusion upon seclusion and interception of private communications: an uninvited third party secretly listening to or recording the substance of a communication that the speaker directed to another recipient. The digital mechanism changes the technology, not the nature of the privacy harm.

50. The injury is particularized because the search phrase was Plaintiff's own communication and was associated with identifiers generated from or stored on Plaintiff's own browser/device. Plaintiff lost control over the dissemination of that specific communication and over whether commercial data companies could append it to persistent profiles.

51. The subject matter is sufficiently sensitive to implicate a protectable privacy interest. A search for "autistic friendly video games" concerns autism and can disclose or invite inferences about neurological, developmental, caregiving, family, educational, or health-related interests. Plaintiff does not allege that the query proves any diagnosis. The injury lies in third parties learning and commercializing the sensitive inquiry itself without permission.

52. The intrusion was highly offensive because it was covert, commercial, multiparty, and persistent. Plaintiff was not merely observed in a public place. Code embedded in Nintendo's Website allegedly caused the substance of a private search to be copied to external advertising systems, combined with identity signals, and used to influence later advertising outside the Website.

53. The scope magnified the offensiveness. The forensic investigation identified multiple recipients with independent profiling capabilities - including Meta, TikTok, Xandr, The Trade Desk, Adobe Audience Manager, and Google/DoubleClick - rather than a single service provider using data solely to return Nintendo search results.

54. The interception also deprived Plaintiff of the ability to decide whether to reveal the search to each recipient, to avoid creation of advertising profiles around that subject, and to prevent repeated exposure to advertisements that reflected the confidential inquiry. Those are injuries to informational privacy and seclusion, not mere statutory technicalities.

55. Two days after the visit, Plaintiff memorialized what had occurred in a written communication: she identified the Nintendo visit and search, stated that she had entered the confidential query "autistic friendly video games," reported that she had

begun seeing social-media ads for the same subject, stated that she had seen no warning and had not consented to a privacy policy, and complained that Nintendo appeared to have shared her confidential search without permission. This contemporaneous account predates the later forensic testing and independently corroborates the particular communication and privacy injury alleged here.

## V. CLASS ACTION ALLEGATIONS

56. Plaintiff brings this action under Federal Rule of Civil Procedure 23 on behalf of herself and a California Class defined as: All persons in California who, during the applicable limitations period, visited www.nintendo.com and had the contents of a search, form entry, or other substantive Website communication intercepted or disclosed to a third-party tracking, advertising, analytics, audience-management, or data-broker service without effective prior consent.

57. Excluded from the Class are Defendant; Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; the Court and its staff; and any person who validly releases the claims asserted herein.

58. The members of the Class are so numerous that joinder is impracticable. Nintendo operates a heavily trafficked consumer Website serving California and deployed tracking code automatically to visitors during the relevant period. The precise number and identities of Class members can be determined through Defendant's analytics, tag-management, consent, and network records and through records of the recipient vendors.

59. Common questions predominate, including whether Nintendo embedded the challenged tracking technologies; whether third parties contemporaneously acquired Website communications; what communication content, event data, and identifiers were transmitted; whether interception occurred before effective consent; whether Nintendo aided and enabled third-party interception; whether class members possessed legally protected and reasonable privacy interests in the contents of their Website communications; whether the covert disclosure constituted a serious and highly offensive

invasion of privacy; and the availability of statutory, actual, punitive, declaratory, and equitable relief.

60. Plaintiff's claims are typical because they arise from the same Website architecture and course of conduct as the claims of other Class members. Plaintiff and the Class were exposed to the same or materially similar tracking technologies and the same absence of effective prior consent.

61. Plaintiff will fairly and adequately protect the Class. She has no interest antagonistic to the Class and has retained counsel experienced in privacy, consumer-protection, and class litigation.

62. A class action is superior because individual statutory privacy claims may be too small to litigate separately, common technical evidence will drive liability, and centralized adjudication avoids inconsistent determinations concerning the same Website code and tracking architecture.

## VI. CAUSES OF ACTION

### COUNT I

### Violation of California Penal Code § 631(a)

63. Plaintiff realleges and incorporates each preceding paragraph as though fully set forth herein.

64. California Penal Code section 631(a) prohibits, among other things, willfully and without consent tapping or making an unauthorized connection with a communication line; reading, attempting to read, or learning the contents or meaning of a communication while it is in transit or passing over a wire, line, cable, or instrument; using information so obtained; and aiding, agreeing with, employing, or conspiring with a person to commit those acts.

65. Plaintiff's search query "autistic friendly video games" was the contents and meaning of an electronic communication. Plaintiff sent it to Nintendo through Nintendo's search interface for the limited purpose of receiving Nintendo search results.

66. On information and belief, the third-party trackers described above acquired or learned the contents or meaning of Plaintiff's search, or a request/event containing or reflecting that search, contemporaneously with Plaintiff's communication with Nintendo. The acquisition occurred through code that caused Plaintiff's browser to send parallel third-party requests during the page/search transaction, not solely from a later review of stored Nintendo records.

67. The third-party recipients were not parties to Plaintiff's confidential search communication merely because Nintendo embedded their surveillance code. Plaintiff communicated the search to Nintendo. Meta, TikTok, Xandr, The Trade Desk, Adobe, Google/DoubleClick, and similar advertising recipients were separate entities receiving copies or derivatives of the communication for their own advertising, audience-building, measurement, or profiling purposes.

68. Nintendo independently violated section 631(a), and alternatively aided third-party violations or agreed with, employed, or conspired with third-party recipients, by intentionally incorporating the trackers, configuring or permitting the relevant events and data transmissions, causing visitors' browsers to initiate third-party requests, and deriving commercial benefit from the resulting advertising and analytics capabilities.

69. The interception was without Plaintiff's prior consent. Plaintiff received no pre-search disclosure identifying the third-party recipients and did not affirmatively agree that they could contemporaneously acquire the contents of her search.

70. Plaintiff's injury is not based merely on disclosure of an IP address or a generic URL. It is based on interception of the specific semantic search she authored, linkage of that content to identifying and persistent signals, and consequent loss of control over a sensitive communication. The precise search, the subsequent topic-matched advertising, and the forensic evidence of pre-consent third-party tracking make the injury concrete, particularized, and plausible.

71. As a direct and proximate result, Plaintiff suffered invasion of privacy, loss of confidentiality and control over her communication, unwanted commercial profiling

and retargeting, and the other injuries alleged herein. Plaintiff seeks statutory damages, actual damages where proven, injunctive relief, and all other remedies available under section 637.2 and applicable law.

**COUNT II**

**Intrusion Upon Seclusion**

72. Plaintiff realleges and incorporates each preceding paragraph as though fully set forth herein.

73. Plaintiff had a legally protected privacy interest in the content of the confidential search she submitted through Nintendo's search field and in deciding whether unrelated advertising and data-broker entities could contemporaneously receive, record, profile, and commercialize that content.

74. Plaintiff had a reasonable expectation that the search would be processed by Nintendo to return Nintendo search results, not covertly copied to multiple third-party surveillance systems before she had received notice or consented. Plaintiff did not knowingly expose the search to those third parties.

75. Defendant intentionally intruded into Plaintiff's private affairs by embedding and enabling spyware that secretly caused the content and associated identity signals of Plaintiff's Website interaction to be acquired by third parties for advertising, audience building, and profiling.

76. The intrusion would be highly offensive to a reasonable person. It involved a sensitive autism-related search; occurred invisibly and before any meaningful notice; involved multiple commercial surveillance entities; enabled cross-session and cross-site recognition through cookies and synchronized identifiers; and was followed by advertising keyed to the same subject matter.

77. The offensiveness does not turn on whether Plaintiff's search proves that she or any particular person has autism. A reasonable person may regard the fact that she privately sought autism-friendly products as sensitive and may reasonably object to that inquiry being silently fed into commercial advertising profiles.

78. Defendant's conduct was a substantial factor in causing Plaintiff's injury because the third-party code operated only because Nintendo embedded, enabled, or permitted it on Nintendo's Website.

79. Plaintiff suffered actual harm including loss of privacy, loss of seclusion, loss of control over dissemination of the search, and unwanted profiling and targeted advertising arising from entry of a sensitive inquiry into the advertising ecosystem. Plaintiff seeks compensatory, nominal, and punitive damages as permitted by law, as well as equitable relief.

## COUNT III
## Violation of the Right to Privacy
## California Constitution, Article I, Section 1

80. Plaintiff realleges and incorporates each preceding paragraph as though fully set forth herein.

81. Article I, section 1 of the California Constitution expressly identifies privacy as an inalienable right. The constitutional right protects, among other things, informational privacy and the individual's interest in controlling the collection, use, and dissemination of personal and sensitive information, including against serious invasions by private actors.

82. Plaintiff possessed a legally protected privacy interest in the contents of the confidential search she authored and submitted through Nintendo's search interface, including the sensitive phrase "autistic friendly video games," and in deciding whether that communication would be disclosed to third-party advertising networks, audience brokers, social-media platforms, analytics companies, and data-management systems.

83. Plaintiff had a reasonable expectation of privacy as against those third parties. She intentionally communicated the search to Nintendo for the limited purpose of obtaining Nintendo search results. Before she searched, Nintendo did not display a consent banner, identify the third-party recipients, disclose that advertising or profiling

systems would contemporaneously receive the substance or meaning of her interaction, or obtain her affirmative consent.

84. Nintendo's alleged conduct constituted a serious invasion of that privacy interest. The interception was covert and contemporaneous; concerned a sensitive autism-related inquiry; occurred before meaningful notice or consent; involved multiple commercial surveillance entities with independent profiling capabilities; and was coupled with persistent cookies, synchronized identifiers, device/browser signals, and advertising identifiers capable of linking the sensitive event to a continuing user or browser profile.

85. The invasion was not rendered insubstantial merely because the communication occurred through a website. Plaintiff did not publish her search to the public or intentionally transmit it to Meta, TikTok, Xandr, The Trade Desk, Adobe Audience Manager, Google/DoubleClick, or other advertising recipients. The alleged spyware used Nintendo's control of the Website to place those entities silently in the communication path and to enable them to acquire or learn information about Plaintiff's private interaction.

86. Nor did Plaintiff waive her constitutional privacy interest by being a consumer privacy tester or by visiting a commercial website. Plaintiff was genuinely interested in Nintendo products and information, did not know the specific surveillance architecture in operation, and did not consent to disclosure of her confidential search to third-party advertising and profiling entities. The absence of a pre-search notice or consent request reinforced, rather than defeated, her expectation that the free-form query would be processed by Nintendo for Nintendo search results.

87. The invasion was sufficiently serious because it deprived Plaintiff of control over a sensitive communication and enabled its commercial exploitation outside the context in which she disclosed it. Plaintiff alleges that after submitting the search she began receiving social-media advertising for "autistic friendly video games" and closely related content, demonstrating the concrete consequence of allowing a confidential inquiry to enter an external advertising ecosystem.

88. Nintendo intentionally designed, selected, embedded, enabled, configured, or permitted the tracking technologies and third-party integrations described herein. Its conduct was a substantial factor in the interception and disclosure because the third-party code and network calls operated through Nintendo's Website and would not have been placed in Plaintiff's communication path absent Nintendo's implementation or authorization.

89. As a direct and proximate result, Plaintiff suffered loss of privacy, loss of control over dissemination of her confidential search, unwanted profiling and retargeting, and a serious invasion of her informational privacy and seclusion. Plaintiff seeks declaratory, injunctive, compensatory, nominal, punitive, and other relief to the extent available under California law.

## PRAYER FOR RELIEF

a. An order certifying the proposed Class under Federal Rule of Civil Procedure 23 and appointing Plaintiff as Class representative and her counsel as Class counsel;

b. A declaration that Defendant's conduct violated California Penal Code section 631(a), constituted intrusion upon seclusion, and violated Plaintiff's and Class members' right to privacy under article I, section 1 of the California Constitution;

c. Statutory damages to the fullest extent permitted by California law;

d. Actual, compensatory, nominal, and punitive damages where available and proven;

e. Appropriate injunctive and equitable relief requiring Defendant to cease nonconsensual interception and disclosure of Website communications and to implement effective prior consent controls;

f. Restitution and disgorgement to the extent permitted by law;

g. Pre- and post-judgment interest;

h. Reasonable attorneys' fees and costs where authorized; and

i. Such other and further relief as the Court deems just and proper.

Dated: September 8, 2026

PACIFIC TRIAL ATTORNEYS, P.C.

By: */s/ Scott J. Ferrell*

Scott. J. Ferrell
Attorney for Plaintiff